UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHRYN LYNN
SPOONER,

                Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

                Defendant.

_____/

Case No. 4:19-cv-13379
District Judge Matthew F. Leitman
Magistrate Judge Anthony P. Patti

## REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 19), GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 21), and AFFIRM THE COMMISSIONER'S DECISION

**I.    RECOMMENDATION**:  For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (ECF No. 19), **GRANT** Defendant's cross-motion for summary

judgment (ECF No. 21), and **AFFIRM** the Commissioner's decision.

**II.    REPORT**

Plaintiff, Kathryn Lynn Spooner, brings this action under 42 U.S.C. §§

405(g) and/or 1383(c)(3) for review of a final decision of the Commissioner of

Social Security ("Commissioner") denying her applications for disability insurance

(DI) and supplemental security income (SSI) benefits.  This matter is before the

United States Magistrate Judge for a Report and Recommendation on Plaintiff's motion for summary judgment (ECF No. 19), the Commissioner's cross-motion for summary judgment (ECF No. 21), Plaintiff's reply (ECF No. 22), and the administrative record (ECF No. 12).

### A.    Background and Administrative History

Plaintiff filed her DI and SSI applications on July 14, 2016, alleging that her disability began on April 7, 2012, at the age of 32.  (R. at 178, 182.)  In her disability report, she alleged that certain conditions (post-traumatic stress disorder (PTSD), manic depression, attention deficit hyperactivity disorder (ADHD), and anxiety) limit her ability to work.  (R. at 217.)  On August 24, 2016, the SSA determined that Plaintiff was not disabled as to each application.  (R. at 67-96.)

Plaintiff requested a hearing by an Administrative Law Judge ("ALJ").  (R. at 113-114.)  On May 30, 2018, ALJ Robert Tjapkes held a hearing, at which Plaintiff, and a vocational expert (VE), Mary Everts, testified.  (R. at 33-66; *see also* R. at 300-302.)  On September 17, 2018, ALJ Tjapkes issued an opinion, which determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 12-32.)

Plaintiff requested review of the hearing decision.  (R. at 174-177.)  However, on September 18, 2019, the Appeals Council denied Plaintiff's request for review.  (R. at 1-6.)  Thus, ALJ Tjapkes's decision became the Commissioner's

final decision.  Plaintiff timely commenced the instant action on November 15, 2019.

### B.    Plaintiff's Medical History

The administrative record contains approximately 430 pages of medical records, which were available to the ALJ at the time of the September 17, 2018 decision.  (R. at 32, 327-756 [Exhibits 1F-21F].)  Plaintiff's medical records will be discussed in detail, as necessary, below.

### C.    The Administrative Decision

Pursuant to 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), at **Step 1** of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity (SGA) since April 7, 2012, the alleged onset date (AOD).  (R. at 17.)  At **Step 2**, the ALJ found that Plaintiff had several severe impairments (obesity, borderline personality disorder, bipolar disorder, PTSD, and degenerative cervical and lumbar disc disease).  (*Id*. at 17.)  At **Step 3**, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (*Id*. at 17-19.)  **Between Steps 3 and 4** of the sequential process, the ALJ evaluated

Plaintiff's residual functional capacity ("RFC")[1] and determined that Plaintiff had

the RFC:

> . . . to perform light work [*i.e., exertional limitations*] . . . except she
> cannot climb ladders, ropes or scaffolds [*i.e., postural limitations*].
> She cannot perform work around hazards such as unprotected heights
> or unguarded, moving machinery [*i.e., environmental limitations*].
> She can perform only simple routine tasks with no fast paced or
> production rate work [*i.e., understanding and memory and/or
> sustained concentration and persistence limitations*].

(*Id*. at 20-25.)  At **Step 4**, the ALJ determined that Plaintiff was capable of

performing past relevant work as a coffee shop counter attendant, as this work did

not require the performance of work-related activities precluded by Plaintiff's

RFC.  (*Id*. at 25-26.)  Then, in what amounts to an alternative **Step 5** finding, the

ALJ considered Plaintiff's age, education, work experience, and RFC, and found

that there are other jobs that exist in significant numbers in the national economy

that Plaintiff also could perform.  (*Id*. at 26-27.)  The ALJ therefore concluded that

Plaintiff had not been under a disability, as defined in the Social Security Act, from

April 7, 2012, through the date of the decision.  (*Id*. at 27.)

   **D.    Standard of Review**

---

[1] The claimant's "residual functional capacity" is an assessment of the most the
claimant can do in a work setting despite his or her physical or mental limitations.
20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard v. Comm'r of Soc. Sec*., 276 F.3d
235, 239 (6th Cir. 2002).

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384,

395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487

(1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this

Court defers to that finding 'even if there is substantial evidence in the record that

would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*,

581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a

decision of the Commissioner will not be upheld where the SSA fails to follow its

own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting

*Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### E.    Analysis

Although Plaintiff claims to address three issues, she briefs only two in her

motion:  (1) the exertional limitation of light work; and, (2) the ALJ's Step 3

finding that her mental impairments do not meet or medically equal the criteria of

listings 12.04.  (ECF No. 19, PageID.879-890; *see also* ECF No. 22.)[2]  Plaintiff has

the burden of proof on these issues.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525,

529 (6th Cir. 1997).

### 1.    The exertional limitation of light work

---

[2] And, even if eventually addressed in her reply brief, issues raised for the first
time in a reply brief are waived.  *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553
(6th Cir. 2008).

Plaintiff's first statement of error challenges the ALJ's conclusion that she is capable of performing "light exertional work on a regular and sustained basis," given that she is "in need of both lumbosacral and cervical surgeries[.]" (ECF No. 19, PageID.884.) Plaintiff claims that her "herniated cervical and lumbar discs" each require "surgical intervention." (*Id*., PageID.881.) But, the bulk of Plaintiff's "neck and low back conditions" argument takes issue with the ALJ's statement that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. at 21; ECF No. 19, PageID.882-883.)

### a.      The evaluation of symptoms, including pain

The SSA acknowledges that "symptoms, such as pain, are subjective and difficult to quantify," and, thus, provides that "any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The SSA will consider relevant factors, which include, *inter alia*, daily activities, pain, medication, and treatment. (*Id*.) "The determination or decision must contain specific reasons for the weight given

to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3P, 2017 WL 5180304, *10 (S.S.A. Oct. 25, 2017).

### b.   The ALJ's reasons

The ALJ put forth several reasons to explain why Plaintiff's "reports of severe back pain are not fully supported by the record[,]" (R. at 21), of which Plaintiff takes issue with several.  (ECF No. 19, PageID.883-884.)  First, Plaintiff points to the ALJ's statement that "[h]er primary care doctor sent her to physical therapy, noting that her exams were normal - she walked with a normal gait and station and had no motor deficits or neurologic compromise."  (R. at 21 (citing R. at 441, 446, 465, 470, 591, 595, 599, 602, 606).)  This observation is appropriate under 20 C.F.R. § 404.1529(a) ("the extent to which your symptoms can reasonably be accepted as *consistent with* the objective medical evidence and other evidence.") (emphasis added).  To the extent Plaintiff argues that her primary care physician, Garry Ng, M.D., "did not perform the stated examinations," and "merely lifted the findings from the initial visit to each subsequent visit without actually re-examining her," (ECF No. 19, PageID.883), the Commissioner responds that "[w]hile this may be true for some of the visits, new findings were included in the treatment notes for April 2016 ([R. at 446]), August 2016 ([R. at

8

441]), and May 2017 ([R. at 602])."  (ECF No. 21, PageID.908 n.11.)  Whatever

the case may be, as the Commissioner notes, "[t]he claimant . . . retains the burden

of proving her lack of residual functional capacity."  *Jordan v. Comm'r of Soc.*

*Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) (citing *Her v. Comm'r of Soc. Sec.*, 203

F.3d 388, 392 (6th Cir. 1999)).  Plaintiff's remarks about repeating findings

without re-examination do not illustrate an inability to perform the exertional

limitations of light work.

Second, Plaintiff points to the ALJ's statement that "[s]he also reported

improvement with Flexeril and her physical therapist noted in October 2016 that

she was being discharged because she had met all treatment goals and was now

independent in a home exercise program."  (R. at 21 (citing R. at 481, 509).)  This

observation is appropriate under 20 C.F.R. § 404.1529(a).  Plaintiff contends that

the ALJ "fail[ed] to add that the improvement in her symptoms was transient," and

that her "back and neck were far more painful and debilitating by her date last

insured [DLI], [December 31, 2017][,]" (ECF No. 19, PageID.883), but she does

not provide any citation in support thereof.

Third, Plaintiff points to the ALJ's acknowledgment of herniated discs (at

L5-6, L5-S1, and C5-6), the ALJ's statement that "the claimant reported over 80%

pain relief from epidural steroid injections to the lumbar spine[,]" and perhaps even

the ALJ's statement that "[s]he also received cervical spine trigger point injections

with improvement." (R. at 21-22; R. at 561-585, 618, 622, 628, 632, 716; R. at 590, 594, 573.) Here, Plaintiff contends that the ALJ "fail[ed] to note that such improvement was not only transient in Plaintiff's case, but that it is always transient at best, as the anti-inflammatory effects of the cortisone dissipate in the days or weeks following injections." (ECF No. 19, PageID.883.) But, it is appropriate for the ALJ to consider "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms[,]" and "[t]reatment, other than medication, you receive or have received for relief of your pain or other symptoms[.]" 20 C.F.R. §§ 404.1529(c)(iv),(v). Moreover, to the extent Plaintiff supports her point with a citation to September 26, 2016 physical therapy progress notes (R. at 477-478), she does not elaborate.

Fourth, Plaintiff points to the ALJ's statement that "neurosurgeon Mark Adams, M.D. noted "completely normal strength in both legs as well as both arms, negative straight leg raising, normal pulses, steady and even gait, ability to heel and toe walk, no sacroiliac joint tenderness, and normal reflexes." (R. at 21 (citing R. at 714).) An observation of normal results is appropriate under 20 C.F.R. § 404.1529(a). Plaintiff seems to take issue with the ALJ's failure to mention that she was also "positive for tenderness and restriction of motion, both in the neck and the low back," (*see* R. at 714 [spinal examination]), or failure to note that Dr.

Adams "recommended surgery starting with her low back and later continuing to include her neck[.]"  (ECF No. 19, PageID.883-884.)[3]

However, the ALJ considered tenderness and range of motion, noting that: (i) Plaintiff's "exams revealed decreased range of lumbar and cervical motion, tenderness to palpation, mildly reduced muscle strength in the right leg, normal sensation and normal gait[,]" (R. at 21 (citing R. at 568, 576, 584)); (ii) Dr. Adams's "only abnormal findings [sic] was reduced range of motion in the cervical and lumbar spine[,]" (R. at 22, 714); and, (iii) "[t]he most remarkable exam findings have been tenderness to palpation and reduced range of spinal motion[,]" which, according to the ALJ "have been taken into account in determining her residual functional capacity[;]" (R. at 23).  Thus, the ALJ appears to have considered the "tenderness and restriction of motion" that Plaintiff brings to the Court's attention.  Further, when reviewing the opinion evidence, the ALJ considered Dr. Adams's May 2018 recommendation for "a lumbar laminectomy,

_____

[3] Plaintiff claims that "her herniated cervical and lumbar discs" each require "surgical intervention."  (ECF No. 19, PageID.881.)  The support for this appears to be Plaintiff's May 30, 2018 administrative hearing testimony that Dr. Adams "wants to focus on my back and get the surgery out of the way and then he's suggested surgery on my neck, but he wants to do the most important part right now and just focus on my back[,]" (R. at 59).  (See ECF No. 19, PageID.869.)  Plaintiff has not supplied a reference to the medical record in support of this hearsay, a review of Dr. Adams's record from December 6, 2017 ends with a plan for "further testing[,]" not surgery (R. at 714), and, as noted elsewhere in this report, the May 2018 lumbar laminectomy recommendation (R. at 754) occurred after Plaintiff's December 31, 2017 DLI.

discectomy and fusion at L5-S1[,]" but considered it among findings "so incongruent with the remainder of the record as to lack persuasive weight." (R. at 23, 754.) In fact, this record post-dates Plaintiff's date last insured (DLI), December 31, 2017. (R. at 140, 147, 205, 249). I am satisfied that the ALJ considered the consistency of the surgical recommendation, whether under 20 C.F.R. § 404.1527(c)(4) or 20 C.F.R. § 404.1529(a).

Finally, Plaintiff seems to take issue with the ALJ's statement that Plaintiff's "updated lumbar imaging studies did not reveal any progression of her degenerative disc disease, nor did nerve conduction testing reveal any neurologic compromise." (R. at 23; ECF No. 19, PageID.884.) Perhaps the ALJ was referring to: (i) the April 2017 lumbar spine MRI (R. at 628); (ii) the October 2017 lumbar spine MRI, which observed, among other things, "very mild degenerative endplate changes posteriorly to the right[,]" (R. at 622); and/or, (iii) the April 20, 2018 notes, which reflect: "EMG nerve conduction of the lower extremities is within normal limits[,]" and "[n]o evidence of nerve entrapment, peripheral neuropathy, radiculopathy, nor myopathy is obtained on today's examination[,]" (R. at 722; *see also* ECF No. 19, PageID.878). In any event, the ALJ is permitted to consider MRIs and nerve conduction studies (NCSs), even if the SSA will not reject a claimant's subjective statements "*solely* because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2)

(emphasis added), and Plaintiff's statement that electromyogram (EMG) and nerve conduction study (NCS) "is typically noted to be only 77% accurate in detecting neurological abnormalities," (ECF No. 19, PageID.884), does not illustrate an inability to perform the exertional limitations of light work. *Jordan*, 548 F.3d at 423. As the Commissioner correctly observes, "Plaintiff still has not produced contrary testing showing that she is more limited than found by the ALJ." (ECF No. 21, PageID.910.) Instead, within this statement of error, Plaintiff's only record citations appear to be from her primary care physician or her physical therapist or Dr. Adams, as discussed above. (ECF No. 19, PageID.883.)

### c. Summation

The ALJ summarized Plaintiff's testimony, including mention of medication for her back pain, use of a heating pad, and soreness and stiffness in her neck. (R. at 20-21; *see also* R. at 53-56, 59.) Presumably referring to her "testimony regarding the severity, extent and chronicity of her low back and neck pain and dysfunction," or "debilitating symptoms," Plaintiff asserts that the ALJ failed "to provide a logical basis for discounting such testimony drawn on the medical evidence of record," and that the ALJ's conclusions "are not well-founded" and "lack substantial support from the record of evidence." (ECF No. 19, PageID.882, 884.) Yet, as delineated above, the various findings with which Plaintiff takes issue were permitted under the regulations – 20 C.F.R. §§ 404.1529 and/or

404.1527 – and are well inside the "'zone of choice' within which the

Commissioner can act, without the fear of court interference." *Buxton v. Halter*,

246 F.3d 762, 772-773 (6th Cir. 2001) (citation omitted).

In addition to assessing postural and environmental limitations, the ALJ

determined that Plaintiff was limited to work at the "light" exertional level. (R. at

20.) Plaintiff claims "it is absurd to conclude" that she is "capable of performing

light exertional work on a regular and sustained basis[,]" given her "need of both

lumbosacral and cervical surgeries[.]" (ECF No. 19, PageID.884; *see also id*.,

PageID.881.) But, after reviewing the medical records, the ALJ explained that

"[t]he most remarkable exam findings," *i.e.*, "tenderness to palpation" and

"reduced range of spinal motion," were "taken into account in determining her

[RFC][.]" (R. at 21-23.) Thus, contrary to Plaintiff's argument otherwise (ECF

No. 19, PageID.884), the ALJ built "an accurate and logical bridge from the

evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.

2000), as amended (Dec. 13, 2000) (citations omitted).

"If the ALJ's decision is supported by substantial evidence, then reversal

would not be warranted even if substantial evidence would support the opposite

conclusion." *Bass*, 499 F.3d at 509 (citing *Longworth v. Comm'r of Soc. Sec.*, 402

F.3d 591, 595 (6th Cir. 2005)); *see also Biestek v. Comm'r of Soc. Sec.*, 880 F.3d

778, 783 (6th Cir. 2017) ("[A] decision supported by substantial evidence must

stand, even if we might decide the question differently based on the same evidence.") (citation omitted).  Here, the ALJ's physical RFC determination was supported by substantial evidence.  It should be affirmed.

## 2.   Evidence of mental health impairments

Under the umbrella of an argument that ALJ Tjapkes "erred in finding that [her] depression failed to meet or equal the criteria of Listed Impairment 12.04[,]" (ECF No. 19, PageID.884), Plaintiff puts forth several arguments related to her mental health impairments.  For the sake of providing background, the ALJ found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.08, and/or 12.15."  (R. at 18.)  To make this finding, the ALJ considered the "Paragraph B" criteria and concluded that Plaintiff has "moderate limitation" in "understanding, remembering, or applying information" and in "concentrating, persisting, or maintaining pace," "mild limitation" in "interacting with others," and "no limitation" in "adapting or managing oneself."  (R. at 18-19.)  The ALJ determined that Plaintiff "cannot perform work around hazards such as unprotected heights or unguarded, moving machinery[,]" and "can perform only simple routine tasks with no fast paced or production rate work."  (R. at 20.)  At least the latter takes into account Plaintiff's "moderate limitation" with regard to "concentrating, persisting, or maintaining pace[.]"  (R. at 19, 24.)

Within her argument, Plaintiff mentions her "her medically ascertained suicidal ideation, her hopelessness, severe depression, anxiety," and describes herself as "a woman repeatedly contemplating killing herself, a woman who has failed again and again to maintain employment in the past, a severely depressed bipolar woman," but notes the RFC's lack of "any restrictions regarding contact with the public" or "minimization of contact with her co-employees or supervisors." (ECF No. 19, PageID.881.)  Similarly, she advocates for "sheltered employment" where she would not be subjected to "interaction with co-employees, supervisors [or] the public." (*Id*., PageID.889.)  In sum, beyond arguing that her mental health impairments meet or equal Listing 12.04, Plaintiff takes issue with the RFC's lack of any "social interaction" limitations.

a.   **Listing 12.04 ("Depressive, bipolar and related disorders")**

Plaintiff contends that "[t]he combined effect of [her] mental impairments is of sufficient severity to meet or equal the criteria of Listed Impairment 12.04," and she quotes various portions of the listing as to "depressive disorder." (*Id*., PageID.885-886.)  But, even if the ALJ's "Paragraph B" findings satisfy Listing 12.04B's requirement of "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning . . . [,]" Plaintiff does not specifically cite medical documentation to establish Listing12.04A(1), *i.e.*, depressive order characterized by five or more listed symptoms – depressed mood, diminished

interest in almost all activities, appetite disturbance with change in weight, sleep
disturbance, observable psychomotor agitation or retardation, decreased energy,
feelings of guilt or worthlessness, difficulty concentrating or thinking, or *thoughts
of death or suicide*.  (*See* ECF No. 19, PageID.886-887.)  Instead, Plaintiff's
medical record citations appear limited to:

    (i)    *a string cite of records from Dr. Lenart*, which include the
           November 2014 initial evaluation (R. at 378) and various
           progress notes dated 2015 through 2017 (R. at 368-369, 371,
           383, 726-728); and,

    (ii)    *Dr. Lenart's May 2017 opinion letter* (R. at 532).

(*See id.*, PageID.886-887.)  Thus, these medical record citations seem more of a
challenge to the ALJ's treatment of Plaintiff's subjective statements or of the
weight assigned to her treating psychiatrist's opinions, which subjects are
addressed below.  Here, to the extent Plaintiff claims that the ALJ "fails to explain
why Plaintiff would nonetheless be suicidal,[,]" (ECF No. 19, PageID.886), it is
sufficient to conclude that the claim that her "psychiatric maladies" are of
"sufficient severity as to meet the criteria of Listed Impairment 12.04[,]" (*id*,
PageID.887), is unsupported as to Listing 12.04A(1)'s elements and, therefore,
unavailing.

        **b.**     **Review of the mental health treatment records**

      The ALJ reviewed records of Plaintiff's mental health treatment, including
records from:  (i) "treating psychiatrist" Harold Lenhart, M.D. (R. at 363-379, 380-

383, 725-730); (ii) Norman Westlund Child Guidance Clinic (R. at 424-434, 521-529); (iii) the mental health assessment of Melissa Escoffre, M.S.W. (*see* R. at 533-560); and, (iv) "individual and group therapy" progress notes (*see* R. at 641-708).  (R. at 22.)

The ALJ then explained why "[t]he record does not support a finding of disability[,]" noting, *inter alia*, that she "received only conservative outpatient treatment of . . . her psychological issues."  (R. at 23.)  In addition to noting that "her therapy progress notes show that she has responded well to a combination of medication with group and individual therapy[,]" the ALJ observed that:

> . . . her mental status exams describe few deficits other than transient changes in mood secondary to situational stress.  There is no decline in memory, attention, cognition, or *interpersonal functioning* to warrant finding greater than *moderate limitation* overall.  She lives independently, cares for her autistic son, maintains her home and advocates effectively for herself.

(*Id*. (emphases added).)  Additionally, in weighing the severely discounted opinion evidence of Dr. Lenhart (about which more will be said below), the ALJ notes that the objective medical records (including Dr. Lenart's own treatment notes) do not support the work preclusive opinion rendered.  In other words, the ALJ considered the consistency of Plaintiff's mental health records, whether under 20 C.F.R. § 404.1527(c)(4) or 20 C.F.R. § 404.1529(a).

Plaintiff's challenge to the ALJ's conclusion that "[t]he record does not support a finding of disability[,]" appears to have two bases, each of which

concerns the ALJ's review of the mental health treatment records.  (ECF No. 19,
PageID.886-887; R. at 22-23.)  First, Plaintiff takes issue with the ALJ's references
to "normal mental status evaluations and intelligence," without an explanation for
"why Plaintiff would nonetheless be suicidal."  (ECF No. 19, PageID.886.)  In so
doing, she uses the aforementioned string citation to Dr. Lenart's records, which
citations mirror those used by the ALJ when stating, *inter alia*:

> Records dating back to November 2014 reveal that she reports both
> medication and therapy to be very helpful and she is described as
> making good progress and growing more confident . . . .  Mental
> status exams are largely unremarkable - she is bright and alert with
> entirely intact cognition; appropriately groomed and dressed; fully
> oriented with goal-directed thoughts; insightful; and stable with *no*
> *signs of psychosis, suicidality, mania, or paranoia* . . . .  She did
> report some fluctuations in mood secondary to going through a
> divorce, but no significant decline in her functioning is described in
> these records.

(R. at 22 (emphasis added); *see also* R. at 368, 369, 371-378, 383, 726-728.)  To be
sure, the Court acknowledges:

(i)     Dr. Lenart's November 11, 2014 progress notes, that Plaintiff
        "had attempted suicide in the past and was hospitalized once for
        it[,]" and with a corresponding mental status examination
        noting that "[t]here is no evidence of any recent self-injury[,]"
        "[m]ood is anxious and depressed[,]" and "[s]he has some
        passive belonging [sic] for death, but denies suicidal intention
        or plan[,]" (R. at 378); and,

(ii)    Dr. Lenart's July 27, 2017 progress note, which reflects that
        Plaintiff "thinks of suicide[,]" and "often wonders if the world
        would be better off without her[,]" with a corresponding mental
        status exam noting that she "reports suicidal thoughts with a
        vague plan[,]" in response to which Dr. Lenart sent Plaintiff to

the emergency room "to talk with the Community Mental
Health psychiatric issue screener to attempt to arrange inpatient
placement for her[,]" (R. at 727).

Plaintiff's briefs to the ALJ and AC reflect that, "[a]lthough she was not
hospitalized, she was enrolled in the Central Michigan Community Mental Health
program (CMH), where she was diagnosed with borderline personality disorder."
(R. at 306, 316.)  Plaintiff's Disability Reports are blank as to "overnight hospital
stays."  (R. at 220-222, 253-255.)  At what appears to have been her next
appointment with Dr. Lenart, he noted, *inter alia*, that she had been diagnosed with
"borderline personality disorder" and was "anxious, but hopeful."  (R. at 728.)

Importantly, Plaintiff's limited references to suicidal ideation within her
argument (*see* ECF No. 19, PageID.881, 886-887) do not illustrate that the ALJ
was errant when stating that "[m]ental status exams are largely unremarkable - she
is bright and alert with entirely intact cognition[,]" (R. at 22).  Additionally, it must
be borne in mind that, "[o]ur task is not to reweigh the evidence.  That is solely the
province of the Secretary."  *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d
472, 472 (6th Cir. 1982) (citing *Wokojance v. Weinberger*, 513 F.2d 210 (6th Cir.
1975)).

Second, Plaintiff claims that "[t]he ALJ admits that the records of . . . her
treating therapist are replete with confessions" of Plaintiff's symptoms, such as
being overwhelmed or suicidal ideation; however, Plaintiff seems to be referring to

the ALJ's review of Escoffre's "initial mental health assessment." (ECF No. 19, PageID.886-887; *see*, *e.g.*, R. at 22, 533-560.) The administrative record also includes progress notes from Community Mental Health for Central Michigan, several of which the ALJ discussed. (R. at 22, 641-708 [Ex. 16F]). Among other things, the ALJ noted that Plaintiff "report[ed] a decrease in both her depression and anxiety[,]" (R. at 22) and that Plaintiff "reported improved interpersonal skills in dealing with her family by using techniques learned in therapy." (R. at 22.) Plaintiff does not appear to challenge the ALJ's statement that "progress notes from August 2017 to March 2018 reflect that she remained psychiatrically stable throughout the period at issue, with no significant decline in functioning." (R. at 22.)

In sum, notwithstanding Plaintiff's doubt about the "inexplicabl[e]" conclusion, the ALJ adequately explained why "[t]he record does not support a finding of disability." (R. at 23.)

### c.   Review of the mental health opinion evidence

Plaintiff challenges the ALJ's treatment of Dr. Lenhart's and therapist Escoffre's opinions. (ECF No. 19, PageID.882, 886-889.) To be clear, the ALJ did not make an assignment of weight to Escoffre's August 9, 2017 psychosocial assessment (R. at 533-560) or the other records from CMH of Central Michigan

(R. at 641-708).  (*See* R. at 23-25.)  Instead, as noted above, the ALJ considered it

within his review of the mental health records.  (*See* R. at 22.)

   As for Dr. Lenhart's May 17, 2017 letter, he explained, *inter alia*, that

Plaintiff was under his care "for treatment of Bipolar Affective Disorder Type 2[,]"

and "her continuing depressive symptoms make her return to the workforce

impossible at this time."  (R. at 532.)  When reviewing the opinion evidence, the

ALJ assigned "little weight" to this medical source statement (MSS).  (R. at 23.)

In so doing, the ALJ accurately acknowledged:  "[Dr. Lenhart] states that she is

motivated to return to work and her prognosis is good, which suggests that he may

not even think her difficulties will persist for at least twelve continuous months."

(R. at 23, 532.)  Plaintiff contends that "the ALJ baselessly and erroneously

discounts Plaintiff's long-time treating psychiatrist [Dr. Lenhart's] conclusion that

'her continuing depressive symptoms make her return to the workplace

impossible.'"  (ECF No. 19, PageID.887; R. at 532.)  Yet, the ALJ explained that

"his opinion that she cannot work 'at this time' is conclusory on a matter that is

reserved to the Commissioner."  (R. at 23.)  Indeed, an opinion that a claimant is

disabled is an issue reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(1).

*See also Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)

(requiring the "ALJ to base her RFC finding on a physician's opinion, 'would, in

effect, confer upon the treating source the authority to make the determination or

decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'") (citing SSR 96-5p, 1996 WL 374183 (S.S.A. July 2, 1996)).

As for the state agency medical consultant's opinion, Dr. Garner concluded that Plaintiff has moderate difficulty in maintaining "social functioning" and "concentration, persistence or pace." (R. at 72, 86.) Dr. Garner also concluded that Plaintiff was "moderately limited" in several "social interaction" limitations. (R. at 77, 91.) Nonetheless, at Step 3, the ALJ found that Plaintiff had only "mild limitation" in "interacting with others," ultimately concluding that "the record does not describe pervasive interpersonal issues affecting all areas of her life." (R. at 19.) The ALJ assigned "partial weight" to Dr. Garner's psychological assessment. (R. at 24.) If Plaintiff had intended to challenge the ALJ's determination that Plaintiff had only mild limitation in interacting with others (R. at 19), *i.e.*, an apparent rejection of Dr. Garner's conclusion that Plaintiff had moderate difficulties in maintaining social functioning (R. at 72, 86), it is not clear. Moreover, such an argument seems unlikely, as Plaintiff contends that, where "the only psychiatrist of record emphatically concludes that she is psychiatrically totally disabled from working," and where this opinion "is supported by the therapist's notes[,]" the ALJ "is not permitted to substitute the opinions of a non-examining

bureaucrat . . . ."  (ECF No. 19, PageID.889).  In any event, "[s]tate agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  SSR 96-6P, 1996 WL 374180, *2 (S.S.A. July 2, 1996).

Plaintiff contends that the ALJ "is not free to disregard competent evidence of disability furnished by a Plaintiff's treating physician."  (ECF No. 19, PageID.888.)  In Plaintiff's case, the ALJ did not.  He expressly considered the MSS of Plaintiff's treating psychiatrist and persuasively explained the assignment of "little weight."  (R. at 23.)  Plaintiff having otherwise failed to illustrate that the ALJ's treatment of the opinion evidence was contrary to 20 C.F.R. § 404.1529, the assignments of weight should be affirmed.

### d.    Treatment of Plaintiff's subjective statements

Plaintiff also references her testimony "regarding the severity of her depression," and the ALJ's treatment of it.  (ECF No. 19, PageID.886.)  Plaintiff challenges the ALJ's observation that "[s]he was able to get her own apartment and continue taking care of her special needs son[,]" (R. at 22 (citing R. at 726)) as a basis for discounting her subjective statements.  (*Id*.)[4]  But, the ALJ is permitted to

---

[4] The Court notes that the ALJ mentioned Plaintiff living independently (R. at 19, 20, 23) and caring for her son (R. at 22, 24) on multiple occasions.  (*See also* R. at 229 [3d Party Function Report], 370 [Dr. Lenhart's Feb. 18, 2016 Progress Notes].)

consider the claimant's "daily activities," 20 C.F.R. § 404.1529(c)(3)(i), and, as the ALJ noted at Step 3, Plaintiff "lives independently and is raising her autistic son largely on her own" in support of the conclusion that she "has experienced no limitation" in "adapting or managing oneself[.]"  (R. at 19; *see also* R. at 71, 84 [July 27, 2016 telephone call].)

Also, when referring to her hearing testimony "quoted at length hereinabove," which is seemingly a reference to her summary of the "lay evidence" (*see* ECF No. 19, PageID.868-870), Plaintiff claims that her testimony "attests to the severity and chronicity of her disability[,]" and "is wholly consistent with and supported by the findings and conclusions" of Dr. Lenhart (the sole psychiatrist of record) and therapist Escoffre, "each of whom saw Plaintiff a number of times."  (ECF No. 19, PageID.888.)  However, to the extent Plaintiff is looking for "specific, concrete bases for rejecting Plaintiff's testimony regarding the extent and severity of her depression," (*id*.), the ALJ did so.  Among other things, he noted that:  (i) "she still experiences 'extreme' depression at least twice per week, but stated that this does not interfere with her ability to care for her son[;]" (ii) "[s]he sleeps poorly due to depression, but then admitted that she practices poor sleep habits[;]" and, (iii) "[s]he claimed to have suicidal thoughts 'regularly' but that she has learned exercises in therapy to deal with these

25

thoughts." (R. at 20-21; R. at 51, 55, 56.)  Plaintiff does not appear to challenge the accuracy of this subjective statement summary.

### e.   Summation

Plaintiff has not shown that her mental impairments meet or equal Listing 12.04 or that the ALJ erred in his review of the mental health treatment records, the mental health opinion evidence, or Plaintiff's related subjective statements.  In her statement of error, Plaintiff contends she "cannot get along with people," her anxiety and PTSD "make her very defensive," she veers back and forth "from struggling to communicate to nervously and aimlessly chattering[,]" and she has difficulty "having interpersonal relationships with her peers and supervisors." (ECF No. 19, PageID.884-885.)  But, these assertions alone – without any citation to corresponding evidence – do not illustrate that she is entitled to social interaction limitations.  In fact, the ALJ recognized Plaintiff's father's Third Party Function Report, including his statement that Plaintiff "cannot get along with people." (R. at 23-24, 228; *see also* R. at 234.)  However, the ALJ assigned "limited weight" to Mr. Scholtz's statements, Plaintiff does not challenge this assignment of weight in her appeal, and the ALJ explained:  "the claimant's issues with social functioning and maintaining concentration, persistence and pace have been taken into account in determining her [RFC].  The statements of her father do not warrant finding greater limitations." (R. at 24; *see also* R. at 228, 234.)  In

sum, notwithstanding multiple challenges, Plaintiff has failed to illustrate her entitlement to a more restrictive mental RFC. *Jordan*, 548 F.3d at 423.

### F.    Conclusion

Plaintiff has not shown reversible error in the ALJ's consideration of her physical ability to perform work at the exertional level or the ALJ's Step 3 finding as to her mental impairments. *Walters,* 127 F.3d at 529. Accordingly, as detailed in the foregoing discussion, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (ECF No. 19), **GRANT** Defendant's cross-motion for summary judgment (ECF No. 21), and **AFFIRM** the Commissioner's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days after being served with a copy, as provided for in Fed. R. Civ. P. 72(b)(2) and E.D. Mich. LR 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers*

27

*Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after being served with a copy of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated:   February 22, 2021

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE